Mr. Hogg, you're up, sir, for your opening. You've reserved five minutes for rebuttal. Cress ahead. Thank you, your honor. I may have pleased the court. I would, unless the court prefers otherwise, I would like to get right to the heart of the matter, which I believe the real issue in the case, there are some other issues related to the facts related to Sheriff Cogdell and Ms. Brixey. I think the real issue in this case is essentially revisiting the issue that was raised in Arenas v. Calhoun, which is whether Mr. Laws had a constitutional duty to go into the cell to intervene in the suicide of Mr. Monroe, even without backup at the time. I think the clear answer, I submit that the clear answer to that question is no, based on Arenas v. Calhoun. The circumstances, of course, that we had with Mr. Laws, the situation on a record, related to a situation that he began shortly before the attempt to suicide, a suicide that was begun by Mr. Monroe that was ultimately successful. He had been returned to the cell from a shower that he had been allowed to take, and then immediately began screaming and yelling because he wanted to have his clothing returned to him, which he had already demanded and insisted previously that morning. He flooded the toilet. It's kind of hard to understand, but it's a submarine toilet, which is basically in a very old, very old jail at the time, and he had to fill it with water and use the plunger to plunge, to actually flush the toilet. Yes, ma'am. Mr. Hogue? Yes. I have a question. Even if we assume, arguing that you're right, that he didn't have to go in without backup, why does that situation? Well, that was part of the policy, Your Honor. That was the one thing that he did not do until after a supervisor called, after his supervisor, Ms. Brixey, arrived. I don't think that by itself constitutes a subjective, deliberate indifference, particularly in the context of he's dealing with an emergency situation, trying to get staff up there. That was the first requirement, was to get backup to be able to get into the cell. 911 would not necessarily have resolved that issue, because there would not have been any other jail personnel to get in there. I mean, it doesn't do you any good to get into the cell if you're not going to try to save the person's life, and if he was not wanting to do the, you know, emergency care, then he needs to 911 people there. So, I mean, even 911, the fact that they come, it takes them a little while to get there, so why wouldn't he call them, even if they don't go into the cell until Brixey gets there, at least if they've been there, that would have given them several extra minutes that can be life-saving when you're not breathing, right? I don't disagree with that, Your Honor. I think the circumstances that you have is they're getting in there to perform CPR as soon as they get in the cell, and then they're calling 911. They didn't ignore it. It just didn't happen as early as it could have, whether that constitutes subjective deliberate indifference by itself. It might be negligence. It might have been negligent for him to do that on a negligent standard, but I don't think it rises to the level of subjective deliberate indifference. In either case, I don't think there's any cases that establish that that by itself rises to subjective deliberate indifference to show it was clearly established. So, let me ask you that. If that's true, if we conclude that there's not a case on point, so it's not clearly established, should there be? Because I'm still struggling to see what is damaging. If I'm driving by the road and I see somebody that's lying on the side of the road, I'm going to call 911. I know that person. I have no obligation to that person, nothing, and I'm not going to be afraid something is going to hurt me because I'm just calling 911. So, I don't understand why calling 911 is some kind of damage to Mr. Logs or anybody else. I'm not saying doing it frivolously. I'm saying when you think you have a... Certainly, certainly. In 2020 hindsight, that should have been done, Your Honor. I mean, there's no question about that. So, should we say, should we make clear, if it's not already clear, that that is an obligation of a prison guard when they have a prisoner that in an emergency situation that they need to call 911 right away? Well, I think... That's a constitutional obligation and we should... I don't disagree with that, Your Honor, at all. I mean, I think it obviously is. It was in the policy. It was what was expected of the jailer to do. He did not do it in this circumstance, but again, I still submit I don't think that rises to the level... It may rise to a level of negligence standard, but it doesn't rise to the level of constitutional violations. Anyway, as I was... There's not any other questions on that, Your Honor. I'll move on. The issue is... And then, of course, because he was using the plunger, he took the... He flooded the... He flooded the cell. Mr. Laws was then having to get the mop out to mop everything up while he was continuing. Then he began to beat around the cell with the plunger and also began... itself and began beating on the wall with that, and shortly after that is when he sat at the desk in front of the jail... I mean, in front of the phone, wrapped the cord around his neck. Mr. Laws' testimony was he couldn't tell whether he was doing it effectively or ineffectively because he appeared to be sitting slumped over in front of the phone. He immediately calls... Starts calling backup according to policy. He calls for backup. He calls the sheriff, calls the jailer on duty, and he calls the jail administrator, Ms. Brixey. Ms. Brixey is the first one to arrive there. That does take approximately 10 minutes. Immediately upon her arrival, they enter the cell, remove the ligature around his neck, and begin CPR. And, of course, that's when, of course, 911 is called at that point. The circumstances... One thing that... There's a couple of issues, I think, with Arenas versus Calhoun in that regard because the question that Arenas left unanswered was if... Would the circumstances be different if they knew, if he knew of the obligation, if he had knowledge of the history of the substance? There's no question of the risk of suicide. There's no question that he had been tagged as a risk of suicide. They called MHMR, and they'd done all these things, removed him from the cell, removed all potential ligatures that they were aware about. In this circumstance, though, and I think that it's a really difficult question for the court to have to answer is, is there a circumstance under which that the jailer has a constitutional duty to ignore policy to assist and not enter a cell without backup? And to... I'm sorry, was there a question? You know, Mr. Polk, you keep focusing on that, and I understand why, because I actually think that's your best argument, but I don't think it's the only issue here. That's the part that's bothering me. The other issue, and maybe you're about to get to it, is Cogdill and Brixey allowed him to be in a cell with a telephone cord that was really long or longer than the 12 inches or why is that? I'm sorry, you're cutting out. Why is the presence of the title not by Cogdill and Brixey? Well, I think you have to look at the facts of each case, and in this case, there were two cell populations, and there was a single cell, both of which had phone cords that were too long, as we know about from hindsight. But what the sheriff did is... I don't believe there's any cases out there that say just putting a suicidal inmate in a cell with a phone cord in and of itself is a constitutional violation. It's deliberate indifference to that risk. But you placing him in that cell, and under the circumstances where he had already been in a cell in general population, he'd already attempted suicide with the sheets and other potential ligatures that were in there, he could not remove all the ligatures from that cell and leave him in that cell because there are other inmates in there. So he moves him to the other cell right next to it, which does have the phone cord. That cell is sitting right in front of the jailer's sit, just a few feet away from it. So he's in constant surveillance all the time, even though suicide watch requirements were 15 minutes at that point. Excuse me, I think I may be cutting out, but... Okay, I'm sorry. Did you say this jail only has two cells? It's just your... Okay, I'm sorry. This jail only had two... There were actually three. There was one for the women, one for the men in general population, and then this single cell. This was a jail that was built in the late 1800s. So there was no other cell designed expressly for the purpose of putting a potentially suicidal inmate. But you're saying there's no other cells at all? I don't believe so, Your Honor. You don't know? I don't believe there are any. I think it's just the three. Well, it's a record show. Record shows it's just the three cells. Three? Yes, Your Honor. And who was in it? One, there was a cell for women, and there was a cell for the men, and then there were another cell. There may have been more actual... I don't recall if there's more cells in the jail. The problem is they couldn't staff those because the jail could have been up to 15 beds. They could only staff it for nine because it was a two-story jail. They have staffing levels. Does that answer your question, Your Honor? Sort of. Okay. There were only three functioning cells that could be used in that jail. But are there not other cells that have taken him? That's a possibility. Yeah, it could have transferred them out to another jail, of course, the additional cost to the county for doing it. But I don't know what jails would have been available. There's not in the record what jails would have been available for inmates to transfer. If he has to be, how long would it have been until he would get a hearing and get a bond hearing or bail hearing and all of that? I mean, what was the timeline here? Well, the timeline here was he was arrested and brought in on Friday by the DPS late in the day. He had a seizure that he went to the hospital for that night. He was released the next day, came back. That was the day that he attempted his first attempt at suicide. And then I mentioned Mark came to visit him that evening, recommended he stay overnight on suicide watch and they would be back the next day. Of course, that morning is when he committed suicide. As far as timeframe, I mean, he would have, I don't think he had been arraigned yet because it was on the weekend. They had sent a notification under 1622 of mental health notification to the justice piece as required by Code of Criminal Procedure. So I expect he would have been magistrated and bonded out or had the ability to bond out early the next week. Okay. So as far as- So Monday would have been the arraignment or subsequent hearing? Yes. Yeah. I believe it was a felony charge on drugs. So obviously he had- So this county does not have the 24-hour magistrates that say Dallas County has? No. No. It's a very rural county, very small county. Okay. The, uh, I would like to briefly address the issue related to Ms. Brixey, particularly as far as her conduct. The only conduct that she was involved in, she was present at the jail when he was brought in, made sure that the information was filed with the magistrate and was not present at the jail. She was present when the MHMR came the next day on Saturday, even though she does not work on weekends. And then the only other issue she was involved in was when a call came in to her on Sunday morning. So she rushed up to the jail that morning. She was not involved in placing him in this cell? No, sir. That was the sheriff that made that decision. Okay. So from that standpoint, regardless, there's not any cases out there that established that it was clearly established law at the time to put him in that cell under those circumstances in a deliberate indifference. So from that standpoint, the sheriff is entitled to qualify. Also, it was not clearly established that there was some obligation on the part of the deputy to do that. The police will argue, well, that's a fact issue that whether or not he recently did that. But I think the standard doing that is sit out of the ring, which is Calhoun. There has never been any constitutional requirement to do that. That's what he recently said just after this case was argued in summary judgment. I don't see how we established that he had an obligation. I'll reserve my other five minutes. All right. Lawyer during the last part of his argument. You want to restate your last statement? Yes, your honor. My last statement was that the law was not clearly established, particularly in the light of arenas versus Calhoun, which was handed down just as the summary judgment was being entered in this case. Summary judgment order. It was clearly not established that Mr. Laws was under constitutional duty to go into the cell without. I'm sorry, but that that transmission was. Sorry. I don't know whose fault it is. All right, well, he has to come back on rebuttal, so maybe you'll reiterate Mr. Hogg and maybe your audio will be a little bit better. All right. Mr. Thomas, you're on. Thank you, your honor. Bruce Thomas. I represent Derek Monroe's mother and the administrator of the state who are the players below. I want to first discuss the defendant's mutated from their motion for summary judgment to the present appeal. I want to clarify a few matters in the record that appellants take liberty with in their brief. I'd like to address the arenas case, of course, and, of course, respond to this court's questions. At page 34 of appellant's brief, they make an extraordinary statement that reveals a fatal flaw in their entire approach to this appeal. They say regardless how appellees try to spin the case, it hinges entirely on whether a clearly established constitutional right existed that compelled Walsh to enter Monroe's cell without backup. That couldn't be more wrong. Our claims against Brixey and Sheriff Cogdell do not hinge in any way on whether Derek has to enter the cell alone or not. And furthermore, that's not our claim against Walsh. What they're is to assume the facts and the light most favorable to the defendants and assume that that was the only scenario available to Walsh, and it wasn't. Let me first briefly address our claims against Sheriff Cogdell and Administrator Brixey, because those have been forfeited here. They don't have anything to do with whether Walsh enters the jail alone or enters the cell alone. We advance our summary response, essentially four principle theories against Cogdell and Brixey. They were deliberately indifferent to Derek's safety and medical needs by placing an acutely suicidal detainee in an isolation cell with a lengthy telephone cord. They were also deliberately indifferent in scheduling only one jailer to work on that weekend, who was effectively instructed not to enter the cell alone, thereby preventing timely intervention and effective intervention in the event of a second suicide attempt. They were also individually deliberately indifferent in failing to summon aid when they were informed by Walsh that an act of suicide was in progress, and they were also deliberately indifferent in failing to transfer Derek to a better equipped facility when they knew they either would not or could not provide him with the safety and protection he needed. Now, if there's no telephone cord that could mean suicide, then there's no issue of Walsh going into the cell. If there are two jailers working, if Administrator Brixey assigns two jailers, that's her responsibility, how many jailers to assign, then there's no issue of whether Walsh has to enter the cell. If anybody calls 911, we know that they got there just over five minutes after Brixey finally calls them after a 15-minute delay, and four paramedics show up, and Walsh doesn't have to go in the cell at all. He just has to open the door for the four paramedics. And of course, if they transfer Derek to a better equipped facility, again, there's no issue. So those issues all raised in our summary judgment response, and they've been forfeited on appeal. And what about laws? Well, what about... Yes, let me turn to laws, and that's a good question, Your Honor, because it also doesn't address all of our claims against laws. But what it does do, what they are trying to do is, of course, re-engineer their appeal in order to try to fit the Arenas case. And in doing so, they're trying to advance the argument that law's only choice was to do nothing until Brixey arrived or to enter the cell alone at the risk of his own safety. And that tries to assume all the factual issues in favor of the defendant. The district court rejected that, and properly so, because we argued that there were underlying fact issues as to, one, whether his safety was at risk, and two, whether those were the only options available to him. In Pallett's reply brief, they try to say that the facts don't really matter because the one issue before the court is objective reasonableness, and that's an issue for the court, but that's an incomplete statement of the standard. Objective reasonableness on summary judgment is determined by viewing the facts in the light most favorable to the plaintiff. And that is what the district court was addressing, and that's what we continue to assert. They want you to address the facts in a light most favorable to them and create a false choice that law's only option was to enter the cell alone and without safety. The fact that summary judgment evidence, excuse me, I'm getting a bit hoarse here. Sorry. Allergies. Summary judgment evidence shows that there are other choices available to him. One, he can call 911 and get the paramedics there in about five minutes, and the video shows the first paramedic there within five minutes and eventually shows that there are four paramedics there. Remember that laws doesn't ask, doesn't need apparently a armed law enforcement officer to go into the cell. He goes into the cell eventually on the basis his backup is a middle-aged unarmed administrator. Well, you know, apparently any warm body will do as far as laws is concerned in order to go into the cell. So I think four strapping paramedics would have been sufficient to go on into the cell given his standard. Let me ask you, Mr. Thomas, let me ask you about the 911 call. I agree just as a matter of morality that he should call 911, but that isn't the question here. What case law, what is your best case that makes it clearly established law that a prison guard in such a situation has to call 911? Well, I admit, I can't set you to a case where a prison guard failed to call 911 upon observing an act of suicide, and I would hope there would be very few instances where that effort actually arises. I think my best case is just pointing you to the Fifth Circuit standard on what deliberate indifference is, such as... ...and to versus Jones, that a prison official is indifferent to an inmate if the official, the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. I can't think of a more reasonable measure to abate it than calling 911. Now, I appreciate that we do not define clearly established law at a high level of generality, but neither do we so granulate it so that we have to find the exact absolute fact pattern in every respect. In this case... Well, you know, I agreed with you in what was then Luna versus Mullinex, in essence, and the Supreme Court 9-0, the small dissent about not having an oral argument, threw that out the water in Mullinex versus Luna. So I've got to respect the fact that the Supreme Court, while not saying you have to have a case exactly on point, has essentially said you need a case pretty close. It's not just enough to say you need to do what's reasonable. You have to have a case that says what is reasonable, that's close to what happened here to put the person on notice. I mean, the facts of Mullinex are very odd, I'll just say that, and yet they give him qualified immunity. So I realize that was a different case of successive force, but still the notion of needing to be notified is out there in a lot of cases. And so if we don't have a case about 911 or something similar, how can we say this is clearly established? Well, first of all, you don't have to reach it because the appellants don't reach it. They don't raise it and address it in their brief. But if you do reach it, there are ample case authority to the fact that a prison official or jailer has to intervene to protect an inmate or a detainee whose safety is at risk and to provide medical needs for suicide prevention. And it just seems unarguable that there's any way to do that without calling the medical people to come. So I think that just necessarily follows here that you've got to call the medical people if you're going to provide medical assistance. That's my best answer. I mean, I'm sorry. They do cite Mullinex both as to laws and as to Cogill and Brixey. I agree, this could have been a better written brief. I'm not arguing that. But as far as whether it was raised, it's clearly raised that the judge did not apply the right standard to clearly establish. Well, they cite those cases, but they don't deal with our argument that we raised in our summary judgment response that laws was deliberately indifferent by failing to call 9-1-1, by failing to get the breathing mask, and from his general lackadaisical attitude during the entire process that delayed response. As they say on page 34 of their brief, they try to make the case turn hinge entirely on whether laws was required to enter the cell without backup at the risk of zone safety. And as you pointed out, that's not the only issue in the case. Do we need any more clearly established law than the Supreme Court has given us, Farmer v. Brown, and this court, Omba and Harvey, whatever, Corinth, in other words, is the law clearly established that deliberate indifference leads to liability? Yes, Your Honor, the law is clearly established that. And is the determination of whether that's present in this case, is that a legal question or a factual question? That is a legal question based upon the facts most favorable to a plaintiff. Which are what? The facts most favorable to the plaintiff is that laws could have got assistance there by calling 9-1-1. Laws could have listed the aid of a trustee in the adjacent cell to go in with the trustee. Laws could have got a breathing mask to have at the ready for when he went in. All the other defendants could have called 9-1-1 immediately to get assistance there. The other defendants could have instructed laws to go in with the trustee or to make sure he had called 9-1-1 to get the paramedics there. All those options and scenarios were available. And none of them... There's a video in this case. So are there any disputed facts here? Or is everything a legal call? There are disputed facts. It is not accurate that we do have a video. That resolves a lot of things. But unfortunately, it doesn't resolve everything. Number one, there's no audio on the video. So we don't know what is being said. We still have the issue of subjective, deliberate indifference, which gets into what the defendants actually know. You can't expect the defendants to confess that they knew the situation was dangerous. The farmer says that we can prove that by circumstantial evidence, which is what we've tried to do. And the court agreed that with at least one of our theories that... Well, I guess the court agreed with all of our theories because it incorporated our summary judgment response by reference. But that the open and obvious nature of the telephone cord made it clear that they must have recognized the dangerousness of the situation. We also had their suicide prevention courses. They had only recently taken and referred to dangerous recorded material, the dangers of being in an isolation cell, and told them that an isolation cell with a do not enter policy, people die that way. Their 10 to 20 years experience in law enforcement... Okay, but I disputed, Mr. Thomas, that this isolation cell was in fact something right next to where the jailer could be in. So it wasn't like you've got this massive jail and you go put somebody in solitary confinement. That's a separate concept here. Well, it's not, Your Honor. Respectfully, it's not, Your Honor, because what I was referring to is the combination of instructioning a jailer, of having only one jailer on duty, and having a policy not to enter, and then putting a detainee in an isolation cell. It doesn't do any good if you're watching them continuously, if you can't enter the cell and render aid. That's ineffectual. That's a facade. There's no reason to do that. And that is what the defendants keep coming back to. They say, oh, well, we made some effort because we watched him. But you don't watch for the sake of watching. You watch for the purpose of rendering aid in the event that there's a suicide. Their own policy recognized that a person could die within five minutes if there's not an intervention, because their highest suicide rating said we watched them continuously or within five minutes. But that's a meaningless standard on paper if you can't go in the cell, as laws interpreted the policy, to keep himself out. The alternative, darker view here, Your Honor, for all the facts that are favorable to the plaintiff is that laws not only didn't care whether Derek lived or died, because after all, who goes back to mopping when they observe a suicide in progress? I mean, I think that just defines deliberate indifference. But the darker theory and evidence, jury could conclude this based upon the totality of the evidence. His laws was perfectly willing to retaliate and punish Derek for all the trouble that he had caused him all weekend. The first suicide attempt after taken to the hospital, bring him back. He was crying all the next morning for an hour. I'm going to I'm going to kill myself. I'm going to kill myself. He defecated on himself, and laws had to deal with that. He has this tirade for a minute before he comes back down. Laws have to deal with that. Laws' picture of indifference outside the cell is just a picture of a man that is just put out, tired of dealing with this and just doesn't care. But those are the I hope that that that's a long answer. But those are all the facts that are favorable to the point which your take on in our case of Jacobs versus West Policiano. Give me your response. I know I saw it in the brief, but as relates to the clearly good case in that case and that that goes to our claims as much against the sheriff of Brixie as it does against laws and Jacobs, they had they knew the detainee was acutely suicidal. Nonetheless, they put him in a effectively a drug tank and gave him sheets just just as they did laws the day before. And the reason they gave him the sheets was because his own lawyer asked him to do so. But the court said said that was still deliberate indifference because they gave an acutely suicidal man the means to commit suicide. So I think that is directly analogous here. That's the case the district court cited. We cite that case. They gave the means for Derek to commit suicide by putting him in that cell along with along with a local and they appreciated subjectively. They appreciated the danger of that on the basis of their their experience, their training, the obvious nature and the technical assistance memo that they got in 2015. I put them on notice in the danger. I understand that they dispute receiving that and they dispute having that knowledge. But that's one of the underlying fact issues. And Stuart. Well, this case doesn't does not involve an action against the sheriff in his official capacity or the county. Is that right? Jacobs, I'm sorry. This case, your case. No, we do. The appeal doesn't. The case does. We did to the county, but I'll pay a little. Yes, sir. That's correct. That's correct. Just briefly, I'd like to mention a couple of record liberties throughout their brief. The appellants say that laws that this this so-called violent outburst of Derek changed laws calculus as to whether he could go into the cell because then he decided that it was too dangerous. But that's not in the record. Laws never testified that he did not go into the cell for that reason. He never makes a causal connection that the appellants are pushing in their brief. In fact, when we specifically asked him in his deposition, can you give us a specific reason why you would have believed you could have been attacked? He can't provide any specific reason. All he refers to is a general possibility, which was the same possibility when he had Derek outside the cell in a small enclosed shower room literally two and a half minutes before. I've seen my time expiring building. I'm sorry. Did he advert to a possibility? What was it? The possibility was that he could be attacked. There was some possibility that he would be attacked, just like there was some possibility he would be attacked when he got Derek out of the cell and took him to the shower. There's always a relative danger for jailers, and the dangerousness is relative to the job. But there was not an extraordinary safety issue from law's point of view because he showed it by his actions two and a half minutes earlier. Thank you. All right. Thank you, sir. All right. We'll back to you for a rebuttal, Mr. Hunt. Thank you, Your Honor. Judge Haynes, just in lying to you, I've never been accused of being the best brief writer in the world, but I believe, as you pointed out, we did raise the issues, particularly the germane issues related to qualified immunity on appeal that were all besides different elements of the record on appeal. Those issues are raised, and I think it is a proper group to reach those. I would like to address some of the factual responses that were just addressed first, and I would like to address specifically first, Judge Stewart, your question. There are really no disputed fact issues in the case. We have acknowledged that in our judgment motion. We acknowledged that in our brief. There is no dispute as far as the timing, as far as what any of the actors did involved in the case. So there's no issue. Isn't it in dispute whether Mr. Laws subjectively realized the danger? Not that morning, Your Honor. I don't think so. I think the key, and this is kind of what the important in the Arenas case, once Mr. Laws, whether he knew it was a substantial risk for him just to be in there with the phone call is one thing. There is no question that he knew it was a substantial risk once he saw him wrap the cord around his neck. So there is no issue on that. The issue then becomes, was it deliberately indifferent? The law clearly established that he had an obligation to go in there despite training, despite what the policy was, and I would disagree. I believe the record is clear that Mr. Laws said there were various reasons not to go in. He wasn't going to go in because of his training. He wasn't going to go in because of his policy. Also, he did have this remote outburst, this outburst right before the incident. I'd also like to address, unless I didn't answer your question, Your Honor, I'm sorry if I cut you off. Well, you've been cutting out. I'm not sure. Okay. I'm sorry. So you don't think the subjective state of Mr. Laws is disputed here? Not that morning. Not that morning. Subjectively knew there was a substantial risk. He saw him beginning to commit suicide. And he responded to that. Called for his backup and began trying to get help there so that he could enter the cell, take care of the situation. Well, he would probably dispute the point that Mr. Thomas made, that he wanted Mr. Monroe to die, or he didn't care if he did. He absolutely did. That's not necessarily an issue here, but I think if you all do go to trial, I'm sure you're going to make an argument contrary on that. Yes, Your Honor. Yes, Your Honor. That is heavily disputed. And you're talking about small counties and people that know each other and know their families. So it's a little bit different situation. Going back to, and I think the key point in Arenas that the court found was different from that was when you're establishing that he was deliberately indifferent, is from the moment Mr. Laws saw him wrap the court around his help, was he deliberately indifferent? And I think evidence clearly shows that he responded. He did not ignore it. I would also dispute record statements that the video shows a lackadaisical attitude on the part of Laws. It does show him mopping and looking, seeing what Mr. Monroe was doing and doing a little bit more mopping. Part of that is just the delay in seeing what's happening and then figuring out what's happening and then making the connection and to go do it. They want to fault him for not running around the jail. Well, he was right there in front of that was the seat on any questions. I asked him about, I asked counsel opposite about Jacobs. You want to respond to there? Yes, your honor. Uh, Jacobs, I believe actually supports our position because in Jacobs, what you had was, we don't have, in this case, there's no, in this case, there's no history of prior suicides in the jail. There is no history of a suicide attempt in the actual cell with tie suicide. There's no evidence of any prior attempts at suicide in the jail whatsoever, or using the phone. I see that I'm out of time. Other questions from the panel before we let him go? Well, I couldn't hear his answer to your last question. Maybe you want to repeat. Okay. Counsel, you're still on. I just asked you about, uh, the same question I'd ask counsel opposite the repeat your, your answer again, sir. Yes, your honor. I believe in Jacobs, the evidence showed that the sheriff had, there had been previous, uh, attempts at suicide in that jail and in that cell using the tie off points in that, in that cell. Um, and that it was the sheriff have having that prior knowledge of the risk of giving the, giving the, um, uh, blanket and the sheet to the inmate in Jacobs versus Feliciano when he knew tie up points had not been addressed when there had been a previous attempt at suicide. That is not the case we have here. We have a case where there's no prior, there'd been no prior attempts, uh, at suicide in that jail. Uh, at least not during this sheriff's tenure. Uh, and there had never been to anyone's knowledge and attempts to harm themselves or to use the phone cord to attempt suicide the day before that. He used a sheet on that. Yes, your honor. Yeah. Okay. There had been no telephone card. Correct. Your honor. Correct. We have to have a case that specifically involved a telephone card before we can say anybody's responsible. Is that right? I believe so. Your honor is they removed all the other potential ligatures from him after that first suicide attempt. So I don't think you can say they were deliberately indifferent to that first suicide attempt. They also removed all his clothing, put him in a smock, put him in a separate cell that was actually had video monitors, uh, that could be watched and also, uh, was right there in front of the desk where the jailer sat. And we can't apply the, the concept of deliberate indifference unless we have a case that specifically involves a telephone cord. Well, and I think what you really have, if you look at the decision at extreme courts, farmers in the farmer versus Brennan case, it talked about whether something is open and obvious, but it talked about it in terms of, had there been previous incidents of it? Is there, has there been a pattern or use in the previous to make something obvious? Just the fact that there's a phone cord in there does not make it obvious that it would be used in a suicide attempt to everyone. If we did not have a case about the phone cord, but the day before he had tried to commit suicide with the phone cord and they said, and then they leave them in there with the phone cord, then that would be Jacob. I, I, I agree. I agree with that analysis. I also think it would be the case if they had had another inmate attempt to do it, uh, use a phone cord previously that they knew about. So, but that was not the case here. They'd never seen it before. That's why it wasn't obvious to him. As far as the 2015, uh, notice, uh, unless I'm out of time, but the, uh, there's no evidence whatsoever that that was actually received by Coleman County. There's no evidence from the state that shows it was actually sent to Coleman County. And the evidence actually shows that it was sent to the sheriff 12 days after the incident, because he requested it when it had been reported to jail. What does the record show as to the time that elapsed between when Mr. Laws first saw, uh, Monroe putting the cord around his or not. But if he had a duty to prevent this suicide, how much time did he have between the time the guy started putting the quarter on his neck and the point at which he was, uh, totally incapacitated and wasn't responsive to a CPR? Well, it was the time, but the right question is, did he have a chance, a good chance to go in and stop this suicide once he saw him start it? I don't think so. Your honor, um, the 10 minutes that it took, uh, for them to get in there. Um, he was still responsive. He was still, they began CPR on him immediately. They were able to rush him to the hospital that paramedics were. And I don't think he died until a day or two obviously too late at that point. Um, obviously if he had gone into the jail earlier, he might have been able to do something. It was also possible that he might've gotten into a struggle with Mr. Monroe, which would have put himself and the security of the jail in danger. You would take the position that the bed sheet is more of an obvious risk than a telephone cord in the jail cell. Yes, your honor. And I think that's, and I think you can see that in the deposition testimony in the records because things like shoelaces and other ligatures, you're talking about, uh, Mr. Thomas talked about the train with cords. All those things have been identified that they took away from it. Those were the obvious ones. It never occurred to them that you might use the phone cord in the cell for that purpose. And I don't think there's any evidence to dispute that. Maybe not, but from a lay person standpoint, it sure to me, things like a phone card is a whole lot easier to hang yourself and having to take bed sheets off, ball them up, time together, string them up, hang from there. You gotta go through a whole lot with a bed sheet. Just look like a phone card right there. I mean, like it's just, you know, kind of there. I hear your argument, but I mean a phone card in the jail, whatever length it is, it's just kind of there. Somebody's got to work with a bed sheet. I mean, depending on their proclivity. But anyway, I mean, what is your argument? No, no, go ahead. I was just going to say, and that's why, you know, once the sheriff, uh, once this happened, the sheriff immediately, uh, had them come in and change out those courts, you know, it was in the cell because of the requirements of reasonable access to, uh, telephones as under state law. Um, so it's a, it's a call service that they can have credit on the calls to call family, things of that nature. Okay. But the question was, uh, was it, it came out of the wall above how high up was, how did, I'm trying to get an idea of how he thought, how he figured that this was going to be a thing he could use to hang himself. It's sit, it sits on the wall, uh, at about, if you're sitting down at sort of eye level, uh, it's right above a table. It's in the cell, a metal table that's in the cell and it's in a seat and it's sitting right above that table. Uh, so if you sit down, it would be eye level or just above eye level. So he could easily and did wrap it around his neck and then fall down and it, it enclosed his neck and strangled. He did not fall down. In this case, what he did was he sat at the, at the desk. Uh, he had the phone cord around him. He had his arms in front of him on the desk. And that's one of the reasons that, uh, deputy laws, Taylor laws said, I couldn't tell whether he had just wrapped around his neck because he was trying to get us to come in there to get his way as far as getting his clothes back. Or if he was really trying to do anything because it looked like his weight was holding him up. So he could not really tell what was happening like that. He did not hang. It was not a case of a classic hanging or anything of that nature. Well, he did it. It did hang forward. Didn't he? I mean, he slumped forward. Yes. On the desk. And he had the cord around his neck. Yes, it did. No question about that. Your honor. All right. Other questions to change any additional questions? Thank you very much. Appreciate the argument. Thank you, your honor. All right. All right. Thank you both counsel for your briefing and your argument. The case will be submitted and we will decide. Um, just includes the cases for argument this morning by video conference. Um, panel stands in recess until tomorrow. Thank you, your honor. Thank you.